IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALICIA HALL | ) | Case No. 1:16-cv-2748 |
| *on behalf of* M.C.L.B. | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## I.    Introduction

Plaintiff Alicia Hall seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income ("SSI") on behalf of her minor child, M.C.L.B., under Title XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ's conclusion that M.C.L.B. did not meet or medically equal Listing 112.05 was not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED AND that the matter be REMANDED in accordance with this Report and Recommendation.

## II.     Procedural History

Hall applied for SSI on behalf of her minor child, M.C.L.B., on December 17, 2013.  (Tr. 142).  The Social Security Administration denied Hall's application initially and upon reconsideration.  (Tr. 84-86, 94-96)  After an October 20, 2015 hearing, Administrative Law Judge ("ALJ") Pamela E. Loesel denied the claim on December 22, 2015.  (Tr. 10-28).  The appeals counsel declined review of that decision, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5)

## III.    Standard for Child Disability Claims

The standard for evaluating a child disability claim differs from that used for an adult's claim.  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec*., 37 F. App'x 146, 147 (6th Cir. 2002).  A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a).  At Step One, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At Step Two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner must assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  This is done by evaluating how a child functions in six domains: (1) acquiring and

using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations[1] in two domains, or an "extreme" limitation[2] in one domain, the impairments functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

## IV. The ALJ's Decision

On December 22, 2015, the ALJ decided:

1. M.C.L.B. was born on July 19, 2002. Therefore, he was a school-age child on November 7, 2013, the date the application was filed, and is currently an adolescent. (Tr. 16)

2. M.C.L.B. has not engaged in substantial activity since November 7, 2013, the application date. (Tr. 16)

3. M.C.L.B. has the following severe impairments: learning disorder; borderline intellectual functioning; affective disorder (adjustment disorder with mixed disturbance of emotions and conduct); anxiety disorder; and personality disorder (disruptive behavior disorder NEC). (Tr. 16)

4. M.C.L.B. does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. (Tr. 16)

5. M.C.L.B. does not have an impairment or combination of impairments that functionally equal the severity of one of the listed impairments. (Tr. 17)

In determining functional equivalence, the ALJ individually evaluated M.C.L.B.'s abilities under all six domains of functioning and made the following findings:

A. Acquiring and using information: marked limitation

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

     B.  Attending and completing tasks:  less than marked limitation
     C.  Interacting and relating with others:  less than marked limitation
     D.  Moving about and manipulating objects:  no limitation
     E.  Caring for yourself (Self-care):  less than marked
     F.  Health and physical well-being:  no limitation

(Tr. 19-25)  Based on these findings, the ALJ determined that M.C.L.B. had not been under a disability since November 7, 2013, the date the application was filed.  (Tr. 25)

**V.      Relevant Evidence**

    **A.       Medical Evidence - Consultative Exams**

On May 13, 2011, Psychologist J. Joseph Konieczny evaluated M.C.L.B at age eight. (Tr. 278-281)  Dr. Konieczny noted that M.C.L.B. had been involved in cruelty to animals (he had killed at least four cats within the previous year) and was physically aggressive with his siblings.  M.C.L.B. had experienced episodes of nocturnal enuresis two to three times a week. M.C.L.B. had repeated the first grade and was currently in second grade.  Hall told Dr. Konieczny that he was "involved in 'IEP class.'"  And she told him that M.C.L.B. had below average and failing grades, but was generally compliant in the school setting.  He had exhibited opposition and defiant behaviors, had been involved in vandalism in the neighborhood, and displayed profane behaviors in the home setting.  M.C.L.B. was not taking any medications.  He was neatly attired and his hygiene was good; he related pleasantly and easily to Dr. Konieczny. (Tr. 279)

Dr. Konieczny noted that M.C.L.B. had taken the WISC-IV in November 2010.  Plaintiff obtained a verbal comprehension score of 87, a perceptual reasoning score of 88, a working memory score of 74, a verbal IQ score of 80, and a FSIQ score of 78.  (Tr. 279-280)  Dr. Konieczny opined that M.C.L.B.'s capabilities in the domains of acquiring and using information, interacting and relating with others, and self-care were below average for an

individual his age. However, his capabilities in the area of attending to and completing tasks were age appropriate. He diagnosed chronic adjustment disorder with mixed disturbance of emotions and conduct, nocturnal enuresis, borderline intellectual functioning, and assigned a GAF score of 50. (Tr. 280)

On March 3, 2014, Psychologist David V. House evaluated M.C.L.B. when he was 11 years, 7 months old and in the fifth grade. (Tr. 283) Hall stated that M.C.L.B. was active, interacted with others "a little," fought with children his age, threw tantrums when he was disciplined, purposefully aggravated and hit his siblings, did not do his chores, and had to be forced to attend to some of his hygiene. She reported that he had issues with running away. There were no reports of recent cruelty, but he had broken the leg of a guinea pig when he was seven years old. (Tr. 285-286)

Hall reported that M.C.L.B.'s grades were terrible, he did not do his homework, he had to repeat the first grade, he had an IEP, he had been suspended once for fighting, and he had been sent to the office frequently. Hall complained that she received phone calls every other day complaining that M.C.L.B. didn't pay attention, cussed, fought and left the classroom. He received counseling at school. (Tr. 286)

M.C.L.B. told Dr. House that he was sad most of the time and angered easily. He denied difficulties with sleep or appetite. He also denied worrying or being lonely. He complained of being bored. M.C.L.B. denied any attempts to injure himself or episodes of excessive crying. He did report seeing a dog that other people didn't see, but it was not clear to Dr. House that M.C.L.B. was hallucinating. (Tr. 287)

Dr. House administered the WISC-IV. M.C.L.B. scored 71 in verbal comprehension, 71 in perceptual reasoning, 68 in working memory, and 75 in processing speed. His full scale IQ

score was 65. (Tr. 287)  The WRAT-IV was also administered and scored a 71 in word reading (3rd percentile and at 1.7 grade level equivalent), 73 in sentence composition (4th percentile and at 1.7 grade level), 69 in spelling (2nd percentile and at 1.5 grade level), 63 in math computation (1st percentile and at 1.7 grade level).  Dr. House noted that M.C.L.B. made an effort during testing and that the results appeared to be valid.  (Tr. 288)

Dr. House diagnosed anxiety disorder, disruptive behavior disorder, learning disorder and borderline intellectual functioning.  (Tr. 288, 290)  For M.C.L.B.'s functional assessment, Dr. House opined that M.C.L.B.'s ability to learn and retain information in one-on-one situations and group settings was somewhat limited due to his borderline intelligence.  He noted elements of distractibility and issues connected to boredom that would cloud his capabilities to some degree. In the domain of attending to and completing tasks, M.C.L.B. was able to pay attention and respond to direct questions from an adult in a one-on-one setting.  Dr. House thought that M.C.L.B. may have some difficulties sustaining attention for prolonged periods and would need redirection from adults to refocus and complete assigned tasks.  (Tr. 289)  In the area of interacting and relating to others, M.C.L.B. was cooperative and pleasant with Dr. House.  He sustained some dialog on topics of interest to him.  He was able to listen to others but did not initiate topics.  He could take directions from others during conversation.  (Tr. 289)  Dr. House thought that M.C.L.B.'s ability to sustain relationships with individuals who were important to him was limited; he could become frustrated with repeated redirection requiring sustained attention.  Dr. House opined that M.C.L.B.'s incidents of disrespect and non-compliance with authority figures stemmed from his tendency to run away.  (Tr. 290)  In relation to self-care, Dr. House thought that M.C.L.B. could complete self-care to some degree with supervision.  His ability to ask for help when needed was limited.  He was not especially aware of his mood states

and did not verbalize appropriate coping skills. M.C.L.B.'s temper outbursts seemed to be related to escape and Dr. House thought he would have difficulty managing more acute emotional reactions. (Tr. 290)

On March 12, 2014, Leslie Rudy, Ph.D., a state agency psychologist, reviewed M.C.L.B.'s records and opined that he had a marked limitation in acquiring and using information, less than marked limitations in attending and completing tasks, interacting and relating with others, and caring for himself but no limitation in moving about and manipulating objects and in health and physical health well-being. (Tr. 66-67)

On June 13, 2014, Courtney Zeune, Psy.D., another state agency psychologist, also reviewed the records on behalf of the agency. Dr. Zeune affirmed the opinions of Dr. Rudy. (Tr. 77-79)

### B. School Records

#### 1. ETR – October 11, 2013

An Evaluation Team Report ("ETR") was completed on October 11, 2013 when M.C.L.B. was in the fifth grade. (Tr. 151-181) He had been receiving specialized instruction since 2010 and continued to be eligible for special education and related services in the category of specific learning disabilities. (Tr. 174, 179) His WISC-IV scores from testing completed on November 4, 2010, included a verbal comprehension index score of 87, a perceptual reasoning index score of 88, working memory index score of 74, processing speed index score of 80 and a full scale IQ score of 78. (Tr. 160)

Dr. Tanja Stitch, a school psychologist, assessed M.C.L.B.'s functioning as part of the ETR. (Tr. 158) She noted that M.C.L.B. had numerous absences - in 3rd grade he missed 31 out of 172 school days and in 2012 he missed 29 out of 179 school days. (Tr. 158) Hall told Dr.

Stitch that M.C.L.B. was not taking any medication and there were no medical concerns that could affect his educational performance. M.C.L.B. told Dr. Stitch that he liked boxing and was going four times per week. (Tr. 159)

M.C.L.B.'s scores on the Ohio Achievement Test administered on May 1, 2013 were 345 in reading and 345 in math, which placed him in the limited range. (Tr. 166) The Woodcock-Johnson III Normative Update Tests of Achievement, Form A administered on September 18, 2013 returned scores in the "very low" range for his age in the following academic areas: brief achievement at a grade equivalence of 2.1, broad reading at a grade equivalence of 2.3, broad math at a grade equivalence of 2.3, math calculation skills at a grade equivalence of 2.4, brief writing at a grade equivalence of 1.7, academic skills at a grade equivalence of 2.1, and academic application at a grade equivalence of 2.1. (Tr. 160-161, 172)

WISC-IV scores from September 20, 2013 included a verbal comprehension index score of 67, perceptual reasoning index score of 86, working memory index score of 74, processing speed index score of 68, and a full scale IQ score of 68. (Tr. 159, 171) Dr. Stitch noted that M.C.L.B.'s "overall FSIQ ability falls in the extremely low range. However, considering the significant difference between his verbal and nonverbal reasoning abilities the overall FSIQ should be interpreted with extreme caution." (Tr. 159)

A Behavior Assessment System for Children-Second Edition (BASC-2) was completed on September 24, 2013. (Tr. 161-162) M.C.L.B. fell in the significant range for depression and the at-risk range for aggression, learning problems, attention problems, and withdrawal. (Tr. 162) M.C.L.B.'s mother, Ms. Hall, also competed the BASC-2. Resulting scores from both assessments placed M.C.L.B. in the at-risk range for all the adaptive skills. (Tr. 162) Daniel McGuigan, an intervention specialist, commented that M.C.L.B. continued to need intervention;

was in danger of failing an academic subject and/or failing to make adequate progress towards his IEP goals due to absenteeism; was in a self-contained single class environment; required many prompts to stay focused and motivated; was below grade level in reading, writing, and math; would shut down and cry often; and demonstrated a need for specialized instructional services in the areas of academic skills and social emotional functioning. (Tr. 163)

### 2. IEP – December 2013

An individualized education program ("IEP") was implemented on December 5, 2013. (Tr. 203-219) when M.C.L.B. was in the fifth grade. (Tr. 203) However, scores from the Brigance Comprehensive Inventory of Basic Skills taken on October 29, 2013 placed M.C.L.B. at the lower second grade level on the math subtest, second grade level on the word recognition grade placement test, and late second grade level on the passage comprehension grade placement test. (Tr. 204) Because his academic achievement levels were several grade levels below his peers, he was required to receive instruction for all core courses in a single classroom environment rather than the general education classroom. (Tr. 211) The IEP listed measurable annual goals for reading and mathematics. (Tr. 207-208. M.C.L.B. was to receive specially designed services for English, language arts, and mathematics in a single classroom environment with direct instruction from an intervention specialist. (Tr. 209) Accommodations and modifications consisted of a reader for questions and answers, small group, and extended time of one hour for reading; a calculator, reader, small group, and extended time of one hour for math; a reader, small group, and double time for science; a reader, small group and extended time of one hour for social studies; and a modified grading scale. (Tr. 209) The IEP called for statewide and district wide testing with M.C.L.B. to receive accommodations in all areas. (Tr. 211)

### 3. Teacher Questionnaire – May 21, 2014

Intervention Specialist Daniel McGuigan completed a teacher questionnaire on May 21, 2014. (Tr. 227-242) McGuigan indicated he had known M.C.L.B. for nine months and had instructed him in all core subjects. M.C.L.B.'s instructional levels in reading, math, and written language were at the second grade level. He was receiving special education services in a self-contained classroom. McGuigan noted that M.C.L.B. was absent and tardy many days. McGuigan checked boxes indicating that M.C.L.B.'s educational disabilities were: 1) mental retardation/mentally impaired/ intellectually limited; 2) emotional disturbance/behavior disorder; and 3) developmental delay "cognitive delay." (Tr. 238)

In the domain of acquiring and using information, McGuigan marked that M.C.L.B. had very serious problems with comprehending and doing math problems, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class instructions. He had serious problems understanding and participating in class discussions, providing organized oral explanations and adequate descriptions and expressing ideas in written form. (Tr. 231)

In the domain of attending and completing tasks, McGuigan opined that M.C.L.B. had a very serious problem paying attention when spoken to directly. He checked boxes indicating that M.C.L.B. had serious problems sustaining attention during play/sports activities, focusing long enough to finish an assigned activity or task, carrying out multi-step instructions, changing from one activity to another without being disruptive, organizing his own things or school materials, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace/finishing on time. (Tr. 228)

On the domain of interacting and relating with others, McGuigan noted that M.C.L.B. had a serious problem expressing his anger appropriately, following rules (classroom, games, sports), respecting/obeying adults in authority, and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. McGuigan wrote that M.C.L.B. displayed a "temper, inappropriate language, crying, hitting people." (Tr. 229)

On the domain of caring for himself, McGuigan rated M.C.L.B. as having serious problems with handling frustration appropriately, being patient when necessary, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood (i.e. being able to calm himself), using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help. (Tr. 237)

### 4.    IEP – November 24, 2014

M.C.L.B.'s IEP was reviewed on November 24, 2014. (Tr. 294-305) At that time, M.C.L.B. was in the sixth grade. (Tr. 295) The Brigance Comprehensive Inventory of Basic Skills was administered on October 29, 2014, and M.C.L.B. scored at the lower third grade level on the math subtest, second grade level on the word recognition grade placement test, and early third grade level on the passage comprehensive grade placement test. (Tr. 295) Goals were set for math and reading and many of his specially designed services were carried over from his previous IEP. (Tr. 300-302) Accommodations were continued in all subjects for statewide and district wide testing. (Tr. 302-303)

### 5.    Teacher Questionnaire – September 1, 2015

McGuigan completed a second teacher questionnaire on September 1, 2015. (Tr. 324-331) Overall, M.C.L.B. seemed to show some improvement; McGuigan did not rate any of his problems as "very serious" on this questionnaire. M.C.L.B. was in the seventh grade but he was

at the fifth grade level in reading and third grade level in math and written language. (Tr. 324)

In the domain of acquiring and using information, McGuigan opined that M.C.L.B. had a serious problem comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. McGuigan wrote a note stating,

> [M.C.L.B.] is non-independent in any academic activity. He is extremely 'needy' and asked for confirmation for everything. He constantly is in need of help from his teacher. He "shuts-down" often during math class. He has difficulty when included with the general ed. Class for specials. This is the 3rd year that I have him in my class all day.

(Tr. 325)

Under the domain of attending and completing tasks, M.C.L.B. had a serious problem carrying out multi-step instructions. McGuigan noted that he was "non-independent – gets extra help always." (Tr. 326) In the domain of interacting and relating to others, McGuigan opined that M.C.L.B. had a serious problem expressing his anger appropriately. Due to his trouble with anger management, behavior modification strategies had been implemented including a behavior plan, passport home, and suspension. (Tr. 327) Finally, under the domain of caring for himself, McGuigan indicated that M.C.L.B. had a serious problem handling frustration appropriately, identifying and appropriately asserting emotional needs, and responding appropriately to changes in his own mood (e.g. calming self.) (Tr. 329)

### 6.     Report Card and Disciplinary Records

Report cards from the 2014 school year showed grades ranging from B's to D's and codes indicating poor classwork and poor behavior. (Tr. 219, 259) Report cards from the 2015 school year show mostly C's and D's with a couple of B's in physical education. (Tr. 258)

School records show that M.C.L.B. receive a three-day out of school suspension in February 2013 for fighting, pushing and hitting another student. (Tr. 168) He received out of

school suspension without instruction for five days in October 2014 and for three days in April 2015.  (Tr. 254-255)

### C.    Hearing Testimony

Hall testified first at the hearing, with M.C.L.B. out of the room.  (Tr. 35)  Hall testified to the following facts: M.C.L.B. lived in a household with Hall, her five other children, his aunt, and her three children.  (Tr. 37-38)  M.C.L.B. is Hall's oldest child.  He was thirteen years old at the time of the hearing.  (Tr. 37)  Hall testified that M.C.L.B. terrorized the rest of the children in the house and was disrespectful to everyone.  (Tr. 39)  He had to be told many times to do chores and was destructive; he had put holes in the wall.  (Tr. 41)  Hall testified that M.C.L.B. did not attend to his personal hygiene.  (Tr. 46)  He wouldn't learn how to tie his shoes.   (Tr. 50)

Hall further testified that M.C.L.B.'s grades were okay.  (Tr. 41)  She felt that his best subject was math and that his hardest subject was spelling and reading.  (Tr. 43)  He had been on an IEP since first grade.  (Tr. 41)  He went to a special class at school.  (Tr. 42)  M.C.L.B. had a lot of friends at school and liked school.  (Tr. 42-43)  He also enjoyed boxing and had been doing that for about two years.  (Tr. 43-44)  M.C.L.B. had been banned from the library.  (Tr. 46)

M.C.L.B. also testified during the hearing, stating that science was his best subject and social studies was his hardest one.  (Tr. 53)  He had one friend in his classroom at school.  (Tr. 54)  There were six students in his classroom.  (Tr. 55)  M.C.L.B. liked to box and had been boxing for four years.  (Tr. 55)  At home, he played the Xbox most of the time.  (Tr. 56)  He admitted that his brothers annoyed him and he fought with them sometimes.  (Tr. 57-58)

## VI.    Law & Analysis

### A.    Standard of Review

The court's review is limited to determining whether substantial evidence in the record

supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

B.    **Listing 112.05**

Hall argues that the ALJ erred in finding that M.C.L.B. did not meet Listing 112.05(D). At the time of the unfavorable decision, Listing 112.05(D) (Intellectual disability: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning) stated:

> The required level of severity for this disorder is met when the [following] requirements . . . are satisfied by
>
> *  *  *
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05 D.  Hall points to IQ testing administered by Dr. House in March 2014 resulting in a full scale IQ score of 65.  (Tr. 287)  Dr. House stated that M.C.L.B. made an effort during the testing and that the results appeared valid.  (Tr. 288)

> The ALJ rejected this IQ score stating,
>
> The child's learning disorder and borderline intellectual functioning do not meet or equal listing 112. 05.  The child, through his representative, asserts that he meets listing 112.05D based on a full scale IQ of 62 (exh. 2F p6).  The claimant's representative asserts that the claimant's testing was considered valid.  The undersigned notes that while the testing was considered valid, testing from 2012 indicate the claimant was at a much higher level of functioning (exh. 1F p3).  Furthermore, school testing records indicate "[M]'s overall FSIQ ability falls in the extremely low range.  However, considering the significant difference between his verbal and nonverbal reasoning abilities, the overall FSIQ should be interpreted with extreme caution." (exh. 1E p. 10).

(Tr. 16)

The ALJ determined that M.C.L.B.'s impairments did not meet or medically equal Listing 112.05 because the evidence did not establish the first requirement of the listing: "a valid verbal, performance, or full scale IQ of 60 through 70." In making this finding, the ALJ rejected two more recent IQ scores and relied on an older IQ score from 2010. Her explanation for doing so contains inaccuracies and calls into question the support for her finding. The ALJ seems to acknowledge that the full scale IQ score of 65 (not 62 as stated in her decision) by Dr. House in March 2014 was valid. (Tr. 16, 287) Indeed, Dr. House opined that M.C.L.B. had made an effort and the results appeared valid. (Tr. 288) Despite noting the validity of this IQ score, the ALJ then stated that testing from 2012 indicated that the claimant was then at a much higher level of functioning. The ALJ cited Exhibit 1F, p.3 in support of this finding. But Exhibit 1F, p3. shows that the cited testing was from November **2010**, not 2012, and yielded scores placing M.C.L.B. in the borderline intellectual functioning category. The ALJ's error is significant because the 2010 test was performed when M.C.L.B. was only eight years old and, according to POMS, was valid for only two years.[3] Thus, the ALJ rejected a recent IQ score of 65 in reliance on a score that, according to the agency's own operations manual, was no longer valid.

Next, the ALJ acknowledged that M.C.L.B.'s overall FSIQ ability fell in the extremely low (as opposed to intellectually disabled) range. (Tr. 16) Indeed, IQ testing performed in September 2013 by M.C.L.B.'s school resulted in a FSIQ score of 68. However, the ALJ

---

[3] The Social Security regulations indicate that IQ testing results generally do not stabilize until the age of 16, and scores obtained between the ages of 7 and 16 are considered current for two years when the IQ score is 40 or above. See 20 C.F.R., Part 404, Subpart P, Appendix 1, § 112.00(D)(10). Social Security Administration's Program Operations Manual System (POMS) § DI 24515.055,11 provides that " [t]est results obtained at younger ages are less reliable and valid than test results obtained at older ages." POMS § DI 24515.055(A), The POMS state that IQ scores obtained at age 7 up to age 16 should be considered current for two years, while "[intelligence test results obtained at age 16 or older may be assumed to apply to the subject's current status provided they are compatible with the individual's current behavior." POMS § DI 24515.055(D).

evidently rejected this score because of a note from the school psychologist who administered the test, which stated:

> [M.C.L.B.'s] overall FSIQ ability falls in the extremely low range. However, considering the significant difference between his verbal and nonverbal reasoning abilities the overall FSIQ should be interpreted with extreme caution. His overall thinking and reasoning abilities exceed those of approximately 2% of children his age. Chances that his true scores of 64-74 are include are 95 out of 100.

(Tr. 159) Contrary to the Commissioner's argument, this note from the psychologist is not clear. Although she stated that the overall score should be interpreted with extreme caution, she also noted that there was a ninety-five percent confidence interval that M.C.L.B.'s true scores were within a broader range from 64-74. Thus, it is unclear why the ALJ rejected the FSIQ of 68 based on the school psychologist's note. The psychologist felt that M.C.L.B.'s IQ fell within a range that included the score of 68 and this score was consistent with the later valid FSIQ score of 65.

The ALJ did not discuss whether M.C.L.B. had an additional and significant limitation of function. Plaintiff contends – and the Commissioner does not dispute – that the evidence established other physical and mental impairments imposing additional limitation of function (ECF Doc. 11, Page ID# 417419). Indeed, the Commissioner acknowledges that the ALJ found that M.C.L.B. had other severe impairments. (ECF Doc. 12, Page ID# 452.) Thus, the ALJ's finding that M.C.L.B. did not meet Listing 112.05 essentially rested on an outdated IQ score from 2010. The ALJ provided little explanation for this portion of her decision and the explanation she did provide contained a significant inaccuracy.

In viewing the record as a whole, the undersigned cannot find substantial evidence supporting the ALJ's determination that M.C.L.B. did not meet or equal Listing 112.05. *Napier v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 147931 (S.D. Ohio, September 4, 2014) *See also*

*McClellan v. Astrue,* 804 F. Supp. 2d 678 (E.D. Tenn. 2011); *see also Dragon v. Comm'r of Soc. Sec.,* 470 Fed. Appx. 454, 2012 WL 987758 (6th Cir. March 26, 2012)(reversing for award of benefits under Listing 12.05 where ALJ improperly ignored and invalidated qualifying IQ scores despite "significant" evidence of deficits in adaptive functioning)*; but see Bailey v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 73140, 2013 WL 2286962 (May 23, 2013)(Spiegel, J., holding that ALJ properly evaluated conflicting evidence concerning Plaintiff's IQ scores, with several scores supporting a finding of borderline intellectual functioning despite additional scores below 70, including one score of 59).

I recommend that the Court vacate and remand the Commissioner's decision for further consideration of M.C.L.B.'s IQ scores to determine whether he meets or medically equals Listing 112.05(D).

### C.      Whether M.C.L.B.'s Impairments Functionally Equal a Listed Impairment[4]

A child's disability is considered to functionally equal the disability Listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one.  20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003).  A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(a) & (e)(2).  The ALJ found that M.C.L.B. had no extreme limitations and only one marked limitation (acquiring and using information).  (Tr. 19-20)  Because only one marked limitation was found, M.C.L.B. did not functionally equal the disability Listings.  Hall argues that M.C.L.B. also had marked limitations in the domains of attending and completing tasks and caring for self.  ECF

---

[4] If the court accepts my recommendation that this case be remanded for further consideration of Listing 112.05(D), Hall's arguments related to whether M.C.L.B. functionally equals a listed impairment would be rendered moot.  Nevertheless, I have included this analysis of the parties' arguments so that there would be no delay in assessing those issues in the event the recommendation were not adopted.

Doc. 11, Page ID# 419-423.  The Commissioner counters that substantial evidence supports the

ALJ's finding that M.C.L.B. had less than marked limitations in these domains.  ECF Doc. 12,

Page ID# 453-459.  Because Hall only challenges the ALJ's findings on two of the six domains,

I will not address the Commissioner's findings on the other four (on one the ALJ found

M.C.L.B. to have marked limitations; on the other three, she found his limitations to be less than

marked or non-existent).

### 1.        Attending and Completing Tasks

In the domain of attending and completing tasks, the Commissioner considers how well

the child is able to focus and maintain his attention and how well he begins, carries through, and

finishes his activities, including the pace at which he performs activities and the ease with which

he changes them. 20 C.F.R. §416.926a(h).  Relevant portions of the Commissioner's functional

equivalence Regulation provide the following guidance in the domain of attending and

completing tasks:

> (1) General. (i) Attention involves regulating your levels of alertness and
> initiating and maintaining concentration.  It involves the ability to filter out
> distractions and to remain focused on an activity or task at a consistent level of
> performance.  This means focusing long enough to initiate and complete an
> activity or task, and changing focus once it is completed. It also means that if you
> lose or change your focus in the middle of a task, you are able to return to the task
> without other people having to remind you frequently to finish it.
>
> (ii) Adequate attention is needed to maintain physical and mental effort and
> concentration on an activity or task.  Adequate attention permits you to think and
> reflect before starting or deciding to stop an activity.  In other words, you are able
> to look ahead and predict the possible outcomes of your actions before you act.
> Focusing your attention allows you to attempt tasks at an appropriate pace.  It also
> helps you determine the time needed to finish a task within an appropriate time-
> frame.

20 C.F.R. §416.926a(h)(1).

The Regulations then set forth the following pertinent age group descriptors for evaluating functional equivalence in the "attending and completing tasks" domain as well as some examples of limited functioning in that area:

(iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

(v) Adolescents (age 12 to attainment of age 18). In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

(3) Examples of limited functioning in attending and completing tasks. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.

(ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.

(iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.

(iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.

(v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. §416.926a(h)(2)(iv), (v) and (h)(3).

The ALJ found that M.C.L.B. had a less than marked limitation in the domain of attending and completing tasks.  (Tr. 20)  The ALJ noted that M.C.L.B.'s ability to attend and complete tasks was complicated by frequent absences and tardiness. (Tr. 21)  She recognized that he struggled with boredom and distraction but he was able to maintain attention and complete tasks when he was engaged.  She cited Dr. Konieczy's psychological consultative report which indicated that M.C.L.B.'s capabilities in this area were at an age appropriate level of functioning. (Tr. 280)  She also cited Dr. House's report which was more vague but noted that M.C.L.B. was able to pay attention and respond to direct questions from an adult in a one on one situation, and that he may be more easily bored in group settings, but there had never been a request to have him evaluated for issues connected to hyperactivity or attention deficit issues. (Tr. 289)  Finally, the ALJ noted that M.C.L.B. enjoyed boxing, playing, football and playing video games, all of which require the ability to attend to tasks in order to perform.

 Hall argues that the ALJ erred in her finding that M.C.L.B. had less than a marked limitation in attending and completing tasks.  Hall's argument does not criticize the record evidence upon which the ALJ relied.  Rather, she points to different evidence from Mr. McGuigan which would have supported a finding that M.C.L.B. *did* have a marked limitation in this domain. ECF Doc. 11, Page ID# 420-421.  Hall's reply invokes case law from other jurisdictions indicating that a claimant's teacher's opinion should be given considerable weight.

Despite this evidence suggesting that M.C.L.B. may have had a greater limitation in attending and completing tasks, other evidence supported the ALJ's finding. Dr. Konieczny opined that M.C.L.B.'s capabilities in this domain were at an age appropriate level of functioning. (Tr. 280) Moreover, the ALJ noted that M.C.L.B. had the ability to attend and complete tasks when he was doing something he enjoyed such as boxing or playing video games. (Tr. 21) The ALJ did not err in relying on this evidence to find M.C.L.B. had a "less than marked" limitation in attending and completing tasks. *See Williams v. Comm'r of Soc. Sec.,* 2017 U.S. Dist. LEXIS 80497 at *51-53 (N.D. Ohio, April 1, 2017); *Zeiger v. Colvin*, 2014 U.S. Dist. LEXIS 125335, 2014 WL 4421395 at * 4, 9-10 (N.D. Ohio Sept. 8, 2014) (affirming denial of benefits where ALJ relied on consultative examiner opinion that found less than marked limitations in attending and completing tasks based, in part, on child's ability to perform household chores and play video games); *Walker o/b/a Walker v. Comm'r of Soc. Sec.,* 2014 WL 4074372 at * 8 (S.D. Ohio Aug. 14, 2014) (finding child's "ability to concentrate on television and video games for such an extended period of time supports the ALJ's conclusion that [the child] does not have a 'marked' limitation in attending and completing tasks"); *Cartwright v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 120767, 2011 WL 4962493, at *9-40 (E.D. Mich. Aug.23, 2011), report and recommendation adopted, 2011 U.S. Dist. LEXIS 120616, 2011 WL 4962413 (E.D. Mich. Oct.19, 2011) (evidence that child played video games and read for 3 to 4 hours daily supported ALJ's finding of a "less than marked" limitation in the attending and completing tasks domain).

The regulations emphasize that "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. §

416.926a(e)(4)(i). The substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The Commissioner's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it. *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

Here, the ALJ's finding in the domain of attending and completing tasks is supported by substantial evidence in the record. Hall's argument that the ALJ should have assigned considerable weight[5] to the opinions expressed by Mr. McGuigan does not negate the evidence supporting the ALJ's decision. Even if the ALJ had accorded McGuigan's opinions the weight Hall argues for, the fact remains that the ALJ had adequate countervailing evidence upon which to rest her conclusion. Furthermore, the cases cited by Hall are not controlling and would not have required the ALJ to assign more weight to Mr. McGuigan's opinion than to those expressed by the consultative examiners. Because substantial evidence supported the ALJ's finding that M.C.L.B. had less than a marked limitation in the domain of attending and completing tasks, I do not recommend remand on this basis.

### 2. Care for Self

In this domain, the Commissioner considers how well the claimant maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and

---

[5] The ALJ's decision to assign little weight to the McGuigan evaluations on the ground that the "degrees of limitation are not defined in a manner consistent with Social Security regulations, and are therefore, somewhat vague" is confounding; McGuigan's two teacher questionnaire responses were set forth on Social Security forms (Form SSA-5665-BK). (Exs. 8E and 9E, Tr. 227-244) If the ALJ found this information to be too vague to be worthy of more weight, then the Commissioner should revise her forms.

whether he takes care of his own health, possessions, and living area. 20 CFR § 416.926a(k).

Caring for self is described generally in the Regulations as follows:

> (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

> (ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

> (iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

> (iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 CFR § 416.926a(k)(1)(i)-(iv).

School age children (age 6-12) should be striving to exhibit the following behaviors:

> You should be independent in most day-to-day activities (e.g., [dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to

avoid behaviors that are unsafe or otherwise not good for you. You should begin
to imitate more of the behavior of adults you know.

20 CFR § 416.926a(k)(2)(iv). (Adolescents (age 12-18) should "begin to discover appropriate

ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings

or listening to music to calm yourself down))." 20 CFR § 416.926a(k)(2)(v).

The Regulations list examples of limited functioning in caring for yourself but qualify the

list of examples by noting that "the examples do not necessarily describe a "marked" or

"extreme" limitation."  Some examples of difficulty children could have in caring for themselves

are:  (i) continues to place non-nutritive or inedible objects in the mouth (e.g., dirt, chalk); (ii)

often uses self-soothing activities that are developmentally regressive (e.g., thumb-sucking or re-

chewing food); (iii) does not feed, dress, toilet , or bathe self age-appropriately; (iv) engages in

self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take

medication), or ignores safety rules; (v) does not spontaneously pursue enjoyable activities or

interests (e.g., listening to music, reading a book); (vi) has restrictive or stereotyped mannerisms

(e.g., head banging, body rocking); or (vii) has disturbances in eating or sleeping patterns.  20

CFR § 416.926a(k)(3).

The ALJ noted these regulations in her opinion. (Tr. 23-24)  Her conclusion as to

M.C.L.B.'s limitations in this domain was as follows:

> <u>The claimant has less than marked limitation in the ability to care for himself.</u>
> Teacher observations reflect the child has an obvious to serious problem caring
> for himself. (exh. 9E).  The child's mother testified that he releases frustration by
> engaging in some destructive behavior, however, there is no evidence to suggest
> that she has sought treatment for the child's actions.  There is no evidence to
> suggest that the child must take medication, and teachers have not expressed
> concern over the child's hygiene.

(Tr. 24)

Hall points again to the opinions provided by Mr. McGuigan and to her own testimony

regarding M.C.L.B.'s behavior to support her argument that M.C.L.B. had a marked limitation in the domain of caring for self. Hall again does not argue that there was no evidence to support the Commissioner's finding. Rather, she argues that evidence supported the conclusion she thought the ALJ should have reached. But, "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm." *Felisky*, 35 F.3d at 1035. Here, the ALJ cited and relied on record evidence to support her finding in the domain of caring for self. The court should not remand on that basis.

## VII. Recommendations

The Commissioner failed to support her finding on whether M.C.L.B. met Listing 112.05 with substantial evidence. I recommend that the final decision of the Commissioner be VACATED and that the matter be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

Dated: November 30, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).